## Commonwealth *v.* Buccieri, Appellant.

*Criminal law—Murder—Premeditation.*

On an indictment for murder where it appears that the prisoner borrowed a penknife, had the owner open the blade for him, and then started in pursuit of the deceased as she was leaving the room, and gave her three deep stabs in different parts of the body, and the whole time that elapsed between the first indication of the prisoner's purpose and the giving of the fatal wounds was not probably longer than between ten and twenty seconds, it is not error to charge " that if for any period of time, no matter how short, there was on the part of the accused, a conscious design and determination to kill, the killing was murder of the first degree."

*Charge of court—Absence of word "willful" in instructions.*

Where the court has in one part of its charge fully and accurately defined murder in the first degree, it is not a ground for reversal, that, at the close of the charge, the court, in recapitulating in substance what had been said, omitted the word " willful."

*Evidence—Motive.*

Where the commonwealth has proven willfulness, and the fully formed purpose to kill, every averment of the indictment is sustained, and the law does not call for proof of a sufficient motive or of any motive.

Where it is admitted or established that the prisoner did the act of killing, the motive is unimportant in determining guilt, unless insanity be set up as a defence, when the absence of any motive which would prompt a sane man to the deed adds to the strength of positive evidence of unsoundness of mind.

*Insanity as defence—Evidence.*

Evidence to support a plea of insanity on an indictment for murder is insufficient, which merely shows that the prisoner was an epileptic, and that the disease weakened the intellectual powers, and in some cases produced total insanity, but fails to show that the prisoner was in any way affected by the disease on the day of the killing.

*Opinion of witness as to insanity of prisoner.*

A witness who is not an expert will not be permitted to express an opinion as to the prisoner's sanity where the acts and conversations upon which the opinion is based, as well as the phase of insanity sought to be proven, have no bearing on the mental condition of the prisoner at the time he committed the crime.

A witness testified that the prisoner at intervals was subject to epilepsy, and that during these attacks and from their effect for a day or two afterward he was mentally irresponsible. The witness had not seen the prisoner thus afflicted for seven months before the killing, and had not seen him at all for four months before the killing. *Held,* that the witness was incompetent to express an opinion as to the prisoner's insanity on the day of the crime.

*Evidence of drunkenness.*

Where the prisoner alleges insanity from epileptic fits, during which he would fall to the floor or ground and lie in a stupor, it is competent for the commonwealth to show that the falls and stupor which the prisoner attributed to epilepsy were really due to drink.

*Opinion of expert witness.*

Where insanity caused by an epileptic fit is alleged as a defence to an indictment for murder, it is competent for a physician, who examined the prisoner an hour after the commission of the crime, to express an opinion as to his mental soundness, although the examination was not for the purpose of ascertaining whether there had been a recent epileptic convulsion. The character of the examination detracted only from the value of the opinion.

A physician may express an opinion upon the mental capacity of the prisoner, from observations made while the prisoner is testifying in his own behalf on the witness stand.

*Charge of court—Appearance and conduct of prisoner.*

Where epileptic insanity is alleged as a defence on an indictment for murder, it is not improper for the court to call the jury's attention to the appearance and conduct of the prisoner at the trial and while on the witness stand.

*Charge of court—Omission to define manslaughter.*

Where there is no evidence on an indictment for murder which points in the remotest degree to the offence as manslaughter, the court commits no error in failing to define manslaughter.

*Indictment—Averment as to weapon—Bill of particulars.*

Where an indictment charges that the prisoner did "feloniously, willfully, and of his malice aforethought kill and murder Sister Mary Hildaberta," it is not necessary that the weapon used should be averred, nor the manner of the killing; nor has the prisoner a right to demand a bill of particulars. A bill of particulars will only be granted to prevent a surprise or injustice; but never to specify the evidence to be adduced by the commonwealth.

*Refusal to grant continuance—Discretion of court.*

An application for a continuance on the ground of want of time for preparation by counsel, and for obtaining witnesses by the prisoner, is an appeal to the sound discretion of the court, and the Supreme Court will not review the exercise of this discretion, except in a case of a very gross abuse of it.

The court may properly refuse a continuance in such a case, where the senior counsel for the prisoner was assigned more than a month before trial, and the junior five days, and communication with their client was easy, and they could invoke all the power of the commonwealth to compel the attendance of witnesses.

*Change of venue—Act of March 18, 1875.*

The Supreme Court will not reverse a judgment on an indictment for

murder because the court below refused a change of venue, where the affidavits in support of the application merely state a belief that a strong prejudice existed against the prisoner by reason of which he could not have a fair trial. In such a case the intensity of the excitement and the extent of the prejudice are peculiarly within the sound judgment of the court where the crime was committed.

*Jurors—Challenge for cause.*

On the trial of an indictment for murder, a juryman may be properly challenged for cause by the commonwealth, who testifies on his voir dire that he did not think that a man who would commit such an offence was of sound mind, and that it would require evidence to change that opinion.

*Adjournment of court—Allowance of time for counsel.*

An adjournment of the trial from Saturday evening until Monday morning, and restricting counsel to two hours for argument, are matters within the discretion of the lower court, which the Supreme Court will not review.

*Answer to points.*

Where facts stated in a point are assumed to be uncontradicted, but in fact are absolutely contradicted, it is no ground for reversal that the court ignored the points without answering them.

*Polling of jury.*

The prisoner has a right to a poll of the jury to ascertain whether each member concurs in the verdict; but the exact words used by a juror in answering are not material, if they indicate clearly the assent of the individual mind to the verdict.

*Evidence on motion for new trial—Review.*

The Supreme Court will not review the action of the court below, in refusing an attachment to compel the taking of certain testimony offered on motion for a new trial.

*Plea of insanity offered at time of sentence.*

A plea of insanity offered at bar when the prisoner is called for sentence is properly rejected when there is no corroborative affidavit accompanying the plea, nor any statement made which might move the court to further inquiry.

Argued Feb. 27, 1893. Appeal, No. 233, Jan. T., 1893, by defendant, Pietro Buccieri, from judgment of O. & T. Berks Co., Sept. T., 1892, No. 98, on indictment for murder. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL and DEAN, JJ.

Indictment for murder.

The facts as they appeared at the trial before ENDLICH, J., are stated in the opinion of the Supreme Court.

Verdict, guilty of murder in the first degree. Defendant

asked to have the jurors polled. Some of the jurors answered, " Guilty in the first degree." Defendant objected to the recording of the verdict. The Court: " The jury may be polled again and each juror as he answers will say by his voice whether or not he finds the defendant 'guilty of murder in the first degree.'" One juror answered again: " Guilty in the first degree." The Court: " Guilty of what?" A. " Guilty of murder in the first degree."

*Errors assigned* are stated in the opinion of the Supreme Court.

*E. H. Deysher, W. B. Bechtel* with him, for appellant, cited, on the question of continuance: State v. Brooks, 39 La. An. 239; Kerr on Homicide, 367; on change of venue: Seams v. State, 84 Ala. 410; State v. Nash, 7 Iowa, 347; State v. Mooney, 10 Iowa, 506; Taylor v. Gardiner, 11 R. I. 182; Com. v. Allen, 135 Pa. 492; Goersen v. Com., 99 Pa. 398; Williams v. Com., 91 Pa. 502; Rex v. Bootyman, 5 Car. & P. 300; on challenge of juryman: Rizzolo v. Com., 126 Pa. 71; on opinion of non-expert witness: Taylor v. Com., 109 Pa. 270; on admission of expert's opinion: Kerr on Homicide, 525; Com. v. McClain, 110 Pa. 270; on charge as to appearance of prisoner: State v. Freidrich, 29 Pacific R. 1059; on polling jury: Williams v. Maryland, 60 Md. 402; Brown v. State, 5 Tex. Law Review, 81; on charge as to design to kill: Com. v. Drum, 58 Pa. 9.

*J. H. Jocobs* and *W. J. Rourke, H. P. Keiser* and *W. Oscar Miller,* district attorney, with them, for commonwealth, cited, as to change of venue: Com. v. Allen, 135 Pa. 492; on charge as to appearance of prisoner: Burrill, Circumstantial Evidence, 502, § 28; on charge as to design to kill: Green v. Com., 83 Pa. 79; Lanahan v. Com., 84 Pa. 84, 87, 89; Cathcart v. Com., 37 Pa. 108; Lynch v. Com., 77 Pa. 207; as to omission to charge upon manslaughter: Brown v. Com., 76 Pa. 319–339; Clark v. Com., 123 Pa. 555–575; McMeen v. Com., 114 Pa. 305; as to 24th specification: Laros v. Com., 84 Pa. 200; as to the 25th specification: McLain v. Com., 99 Pa. 86; Lanahan v. Com., 84 Pa. 80; McCue v. Com., 78 Pa. 190.

OPINION BY MR. JUSTICE DEAN, March 20, 1893:

The prisoner, defendant, Pietro Buccieri, on the afternoon

of the 23d of June, 1892, killed Sister Mary Hildaberta at St. Joseph's Hospital in the city of Reading. Being arrested, tried, and convicted of murder of the first degree, and sentenced to be executed, he took this appeal, alleging as error: (1) The refusal of the court to grant a continuance. (2) The refusal of the court to award a change of venue. (3) Overruling motion to quash indictment. (4) Denying prisoner's application for bill of particulars. (5) Sustaining a challange for cause on part of commonwealth to Thomas J. Hill, a juror called. (6) In sustaining an objection of commonwealth to a question put by prisoner's counsel to Gustano Bruno, a witness, for the purpose of eliciting his opinion of the sanity of prisoner. (7 and 8) Permitting commonwealth to show drunkenness of prisoner in rebuttal of testimony that he was epileptic. (9) Permitting Dr. A. B. Dundore, a witness for the commonwealth, to give an opinion as to prisoner's mental condition an hour or two before the examination, and also an opinion based on insufficient facts. (10) Permitting Dr. Martin Luther to testify as to soundness of memory from observation of prisoner's manner and testimony on witness stand. (11) In refusing to adjourn the court on close of evidence on Saturday evening to Monday morning. (12) In limiting time of prisoner's counsel for discussion of evidence to the jury to two hours. (13 and 14) Error in charge of court on subject of insanity, the principal defence set up by prisoner. (15, 17, 18 and 25) Errors in the charge as to essential elements of murder in first degree, and unfairness of charge towards the prisoner. (19, 20 and 21) Error in not answering at all prayers 1, 2, and 10 for special instructions. (22) Error in polling jury, and accepting and recording verdict. (23) In refusing to attach for contempt witnesses for failure to appear and testify, in obedience to subpœna on motion for new trial. (24) In refusing to order inquiry into sanity of prisoner when called for sentence. (25) In entering judgment on verdict when evidence did not warrant a finding of murder of first degree. There is no 16th assignment of error noted in paper book; while the numbers are 25, there are in fact but twenty-four assignments.

As the 15th, 17th, 18th and 25th assignments allege error in instruction to the jury which tended to bring about the verdict, we will consider them first.

The time that elapsed between the first indication of prisoner's purpose and giving the fatal wounds was not probably longer than between ten and twenty seconds, evidencing, as argued by prisoner's counsel, too short a time for deliberation and premeditation, essential elements of murder of the first degree. The court instructed the jury, " That if for any period of time, no matter how short, there was on the part of the accused, a conscious design and determination to kill, the killing was murder of the first degree." In determining whether the statement of a general rule of law, although correct standing by itself, may be misleading in its application to the facts of a particular case, we must have before us the facts. What are the facts here, either not in dispute or clearly established.

The prisoner is a shoemaker by trade, possessed of some education, is thirty-eight years of age, was born in Italy, came to this country in 1883, located in Reading about the year 1887, carried on his trade there until the 7th of January, 1892. That day, by the explosion of an oil lamp, he was so severely burned in the left arm as to permanently cripple that member ; the same day he was removed for treatment to St. Joseph's Hospital, a Catholic charitable institution in the city of Reading. There he remained until the 23d of June, 1892, being nursed and cared for all the time, and although the injured arm was useless, otherwise he had become strong physically. Sister Mary Hildaberta, the deceased, was about twenty-three years of age, was a member of the religious order of St. Francis, and with other members of her order assisted in ministering to the wants and alleviating the sufferings of diseased and injured patients. She had taken her turn for five and a half months, day and night, in nursing the prisoner and his fellow-sufferers in the hospital ; her last act of kindness to him before he stabbed her was to place a glass of milk at his bedside. About a quarter to four o'clock on the afternoon of the day in question, Laurence W. Scott, another patient, was sitting in an invalid's chair near the entrance to the sick-room, when the prisoner came to him and asked the loan of his knife to mend his pants. Scott handed him the closed knife. The prisoner, having the use of but one hand, asked Scott to open the blade, which he did. Just about this time, Sister Hildaberta had come into the sick-ward with two glasses of milk ; one of them she gave

to a patient, John O'Brien, the other she placed by prisoner's bed; then, she walked towards the kitchen at the other side of the room. All her movements, from the time she entered until she started to leave, were in full view of the prisoner. While she was placing the glasses of milk, he was getting the knife from Scott. After he got the open knife he turned and rapidly followed her, concealing the knife in his hand, out to the kitchen, when he attacked and stabbed her in the breast, hip and abdomen. She tried to escape, turned and ran screaming back into the sick-ward, pursued by the prisoner, when Scott raised his chair to strike him down; then he stopped and gave the knife back to Scott. All three wounds were deep ones; the one in the abdomen indicated that the knife had been twisted around in the wound, as if with intent to cut the intestines or disembowel her, and was necessarily fatal; after intense suffering she died the next day.

In view of these facts, it seems to us, the language of the learned judge, "If for any period of time, no matter how short, there was a conscious design to kill, the killing was murder of the first degree," was proper instruction. The conduct of the prisoner, for the few seconds preceding the fatal stabs, points to both deliberation and premeditation; indeed, it is rare in homicide cases that these operations of the mind are indicated by acts so significant of them, and of nothing else. The prisoner, with the object of his attack in view, observing her movements and that she is about to go to the kitchen, borrows from his fellow-patient a knife, a deadly weapon, the first act indicative of the purpose; every movement from that moment until the moment he plunged it into the body of Sister Hildaberta, distinctly disclosed the existence and persistence of the purpose. He asked that the knife be opened; the purpose, immediate use; concealed it in his hand, that this purpose might not be discovered or interrupted; followed her to the kitchen, where the interference of other patients could not balk him in his purpose, and then with unrelenting ferocity of purpose repeatedly stabbed her.

There can be no purpose in the mind such as this one, which is not the product of deliberation and premeditation; the fact of the one necessarily presupposes the existence of the others. Where a cruel and deadly blow has been struck, and no pre-

cedent conduct significant of an intent to strike has been shown, it is interesting, profitable perhaps, to consider the processes of thought leading to the act, and to discuss the rapidity of the mind's operations in reaching conclusions, in the hope of determining whether it was prompted by a sudden or rash impulse, or was the accomplishment of a fully formed purpose. But when the final act has been preceded by a number of others, following each other in quick succession, but all in regular order, all pointing irresistibly to the purpose, it is idle to waste words in discussing what length of time is essential to deliberation and premeditation in framing in the mind the purpose; the fact of the purpose being shown, the time necessary for deliberation and premeditation, whether long or short, must have passed, just as certainly as the existence of a grain of corn demonstrates that there has been the time necessary to its growth. So that, in this case, if only a few seconds passed from the time the prisoner received the knife until he used it, the law as stated by the learned judge of the oyer and terminer was correct. It was, in substance, the law as stated by Judge Rush in Commonwealth v. Smith, 7 Sm. L. 696, that "no time is too short for a wicked man to frame in his mind his scheme of murder, and to contrive the means of accomplishing it." In his charge to the jury in Drum's Case, 58 Pa. 9, Justice Agnew quotes this expression, and says: "It must be qualified, lest it mislead." Since then, it has often been argued, as is done in this case, that shortness of time between the first indication of a purpose and its accomplishment should at least raise a doubt as to the fact of deliberation and premeditation; as if, after the first thought, there must be time for cogitation, for brooding over it, and this time must be proven by the commonwealth, or no fully formed purpose to kill can be inferred. But this is a mistake; Drum's case has not changed the law. It was there alleged by the prisoner that Mohigan, the deceased, had struck him in the face, and that he, Drum, had then suddenly, before the blow could be repeated, drawn a knife and inflicted the fatal wound. The commonwealth alleged that Drum had provided himself with the knife, and sought the deceased. The question on the evidence was, whether the knife had been provided for the use to which it was put, or whether its use had been suddenly provoked by the attack. Justice Agnew,

who charged the jury, while not denying the correctness of the law in Smith's case, "that no time is too short for a wicked man to frame in his mind his scheme of murder," further said, it might mislead if applied without qualification to the particular facts set up in defence by Drum; for if the knife had not been prepared for the purpose of killing Mohigan, the suddenness of the act in drawing and using it tended to rebut the idea of a fully formed purpose to kill, or deliberation and premeditation. If, without dispute, Drum, before being struck by Mohigan, had drawn the knife, advanced toward Mohigan, and stabbed him, the eminent jurist who tried the case would not have thought it necessary to explain or qualify the law in Smith's case; the fully formed purpose would have been so unmistakably evinced by the conduct preceding the act, although the time in the case supposed would have been very brief, that no explanation would have been called for. Afterwards, in Lanahan v. Commonwealth, 84 Pa. 80, Justice AGNEW fully pointed out the reasons for the qualification in Drum's case.

As to the absence of the word "willful" in the instructions at the close of the charge, recapitulating in substance what had been said on the question of insanity and premeditation, no injury could have resulted to defendant by the probably inadvertent omission. The definition of murder of the first degree had been very clearly stated in other portions of the charge, as well as the distinction between it and murder of the second degree. The jury could not possibly have been misled, or have forgotten the pointed instruction that murder of the first degree is the specific intent to take life of a mind fully conscious of its purpose.

The 18th assignment complains that the general tenor of the charge was unfair to the prisoner, and did not correctly present his case on the evidence.

A charge may be technically correct, and so accurately state the law that no specific error can be pointed to, and still may in its tone be so one-sided as to be liable to the charge of partiality. But, after a careful reading of this charge, and a close scrutiny of all the evidence, we are confident that this assignment is not well founded. The defence of the prisoner, insanity, was prominently brought to the attention of the jury,

as well as the alleged origin or cause of it, epilepsy. On the question of motive, it was practically assumed in the charge that the evidence did not show a motive, and the jury was told that, in considering the other evidence of insanity, they might, along with it, consider the enormity of the crime and the absence of motive in determining whether the prisoner was sane. Certainly, this was all prisoner's counsel had a right to ask. When the accused denies that he committed the act, then the absence of all motive on his part for committing it is a very material fact in his favor; but where it is admitted or established that he did commit it, the motive is unimportant in determining guilt, unless, as in this case, insanity be set up as a defence, when the absence of any motive which would prompt a sane man to the deed adds to the strength of positive evidence of unsoundness of mind.

Here, the commonwealth having proven willfulness, and the fully formed purpose to kill, every averment of the indictment was sustained; the law did not call for proof of a sufficient motive, or of any motive. Who can, with reasonable certainty, in the larger number of homicides, determine the exact motives for them? We have no personal experience to guide us; to courts and juries, so far as concerns their own consciousness, no motive is sufficient to account for willful, deliberate, and premeditated murder; they never committed murder; never wanted to. Observation teaches them, that avarice, jealousy, revenge, and other passions do impel men to murder; that the most trivial slight sometimes starts into action a murderous propensity; at other times, the motive is completely hidden. Here, there was significant evidence of hatred on part of prisoner towards deceased; this, we know, has at times moved wicked hearts to murder. Three or four days before the killing, the prisoner said to Scott, "Me no like this sister; sister no like Italian man." After arrest, he said to policeman Mayer, "She don't like Italian; she wanted to get Italian to jail." When in prison Jacob Kershner asked him, "Why did you do this?" And he said, "I was sick; sister didn't treat me right, didn't like Italian; I didn't like sister." To the peaceably inclined, it is utterly incomprehensible how such a feeling as this should find gratification in the murder of the gentle and inoffensive woman who was the object of it, yet from observation

we do know that there exists in some men just such depth of depravity. This was not even adverted to by the learned judge, and in so far as silence favored the prisoner he had the benefit of it.

As to the 25th assignment, that "the ingredients necessary to constitute murder of the first degree do not exist in the evidence," we do not see that a single one is lacking, if the prisoner at the time of the killing was sane. If he was not sane, the burden was on him to show it. He adduced evidence that he was an epileptic; proved, what is undoubtedly true, that the tendency of that disease in an aggravated form is to weaken the intellectual powers, and in some cases to produce total insanity; but he went no further. The evidence wholly failed to show that his affliction, to any serious extent, impaired his intellect, or that on the 23d of June he was in any degree affected by it. The physicians and others at the hospital, whose duty it was to see him and minister to him, testify that, during his stay there, he had only one attack of epilepsy, and that one about five weeks before the killing. George Morrison, a witness, called by him, testified that he had known him intimately for five years, and that only on two occasions had he seen him act irrationally, and never, in the whole time, had seen him have an epileptic fit. The evidence did not show such a phase of the disease as warranted an inference of general insanity, and there was entire absence of proof that on the day of the crime he was other than of sound mind.

We recur now to the first specification of error, the refusal of the court to grant a continuance to next term.

The ground of the application for continuance was want of time for preparation by counsel, and for obtaining witnesses by the prisoner.

This was an appeal to the sound discretion of the court. A very gross abuse of this discretion would have to appear before we would sustain the assignment; nothing of the kind is here shown. The senior counsel was assigned more than a month before trial, the junior five days; their client was near them; communication was easy; they had daily access to the court, and could invoke all the power of the commonwealth to compel the attendance of witnesses. The prisoner was not a stranger in Reading; he had lived there for some years. The presump-

tion is, the court in refusing a continuance acted with a due regard to the rights of the prisoner, and there is no evidence which rebuts this presumption.

The second assignment is to the refusal of the court to order a change of venue.

The act of assembly of March 18, 1875, provides, that in criminal prosecutions the venue may be changed, when it is made to appear to the satisfaction of the court that from undue excitement against the prisoner in the county where the offence was committed a fair trial cannot be had, or that there exists so great a prejudice against him that he cannot obtain a fair trial.

In support of this application the affidavit of the prisoner and Henry Wickel and George W. Mannerback, two citizens of Reading, were presented. All three state a belief that a wrong prejudice existed against the prisoner in Reading, and that by reason of this prejudice a fair trial could not be had in Berks county. It will be observed that, to secure the change of venue, it must be made to appear to the satisfaction of the court that because of "undue excitement," or from "great prejudice" a fair trial cannot be had. The intensity of the excitement and the extent of the prejudice, if either or both exist, are peculiarly within the sound judgment of the court where the crime has been committed. The credibility of the ex parte affiants is best known to them; popular vindictiveness, which tends to embarrass the administration of justice, obtrudes itself with as much offensiveness on the notice of a judge as on others. With the better opportunity for knowing, the court was not satisfied the prisoner could not have a fair trial in Berks county. To move us to decide there was error in this, we would have to be satisfied by the same affidavits that such excitement or prejudice did exist; would have to credit what the court below did not believe. It is sufficient for us to say that the evidence which failed to satisfy the court below comes far short of satisfying us, especially when the persuasive evidence of the judgment of an impartial court has determined its unsatisfactory character. Indignation, because of the cruelty of the deed, there doubtless was; it would be strange if such were not the case in a law-abiding community; but there is nothing which convinces us of the existence of such passion or prejudice as would prevent the twelve "sober, intelligent, and judicious"

jurors who were sworn to try the issue from rendering a true verdict on the evidence.

The 3d and 4th assignments are to the refusal of the court to quash indictment, and to direct the commonwealth to furnish prisoner's counsel with a bill of particulars.

The indictment itself is drawn in the general terms directed by the criminal code of 1860. There are doubtless cases where it is proper that the prisoner should have, under an indictment so drawn, a more particular specification of the accusation he is called upon to defend against, otherwise he might be taken by surprise. It is enough to say that this does not belong to that class of cases. The indictment charged that, on the 23d of June, 1892, the prisoner within the county of Berks did "feloniously, willfully, and of his malice aforethought, kill and murder Sister Mary Hildaberta." It was not necessary, to constitute a good indictment under our statute, that the weapon used should be averred, nor the manner of the killing; before arraignment, if it be made to appear to the court that any injustice is likely to be done the prisoner because of vagueness of the indictment, a bill of particulars may be ordered: this, not because the prisoner has a right to demand it, but because the court, after trial, on proof of surprise or injustice in consequence of the absence of specific averment as to weapon and manner of killing, would set aside the verdict and grant a new trial.

Here, the indictment set out all the law demanded; a bill of particulars could give the prisoner no information as to the weapon or manner of killing which he did not possess before arraignment. It is not pretended that he was "surprised" by unexpected proof, or that the commonwealth proved the use of a weapon not theretofore known to him, nor that the manner of killing was other than he knew he was charged with. If, by a bill of particulars, was meant a specification of the evidence to be adduced by the commonwealth, this the prisoner had no right to ask nor the court any right to direct.

The 5th assignment is to the decision of the court sustaining the challenging for cause by the commonwealth of Thomas J. Hill, called as a juror.

The juror, on being sworn to make true answers, in substance said he did not think a man who would commit such an offence

was of sound mind, and it would require evidence to change that opinion. This was adopting a rule for the trial of the prisoner, the reverse of that adopted by the law. The law presumed the prisoner sane; Mr. Hill presumed him insane, and expected the commonwealth to prove his sanity. He was clearly disqualified, and the court was right in sustaining the challenge for cause.

The 6th assignment alleges the court erred in refusing to permit a witness, Gustano Bruno, called by prisoner, to give an opinion as to his sanity. The witness was twenty-seven years of age; was a native of same town in Italy as prisoner, and had known him there; knew he there had epileptic attacks frequently, and had heard he was discharged from the army on account of them; the prisoner came to this country about ten years ago, the witness six years afterwards; the one lived at Reading, the other at Robesonia, twelve miles distant; the witness saw prisoner, sometimes once in three months, and sometimes once a month; when they visited each other it was for a day; at times when witness saw prisoner he was attacked with epilepsy; the last attack was in November previous; the last time he saw prisoner was four months before the 23d of June, in February. It will be seen that the intercourse between them was not close; the opportunities for observation were not frequent. The witness was permitted to testify as to the condition of prisoner's mind immediately after the epileptic fits, and at other times when he saw him. But prisoner's counsel put this question:

" Q. From what you know of this man's manner and habit, conduct and appearance, from his sickness for eighteen years as you have testified, from his entire behavior, you may state whether or not at the time he killed Sister Hildaberta he was sane or insane ? "

To this the commonwealth objected, and the objection was sustained.

To sustain the charge of error in this particular, Taylor v. Commonwealth, 109 Pa. 270, is cited, which rules that witnesses, not experts, after testifying to acts and conversations of the prisoner may give an opinion as to his sanity. This is doubtless a correct statement of the law in its application to the facts of that case. But the acts and conversation, as well

as the phase of insanity sought to be proven, must have some bearing on the mental condition of the prisoner at the time he committed the crime. If the alleged unsoundness of mind be a settled, fixed condition, non-expert witnesses could testify, to the extent of their observation, to his daily acts and speech, and, having done so, express an opinion, or give their conclusions from the facts stated by them. If, however, the mental aberrations were fitful or rare, and in the intervals his mind was lucid, it certainly would not be competent for them to express an opinion as to the prisoner's mental condition at a time when for months they had not seen him, merely because on some occasions when they had seen him he gave evidence of mental unsoundness. Such an opinion would be valueless, because the facts testified to would warrant no inference of sanity or insanity on a particular day. Here, the defence was, that the prisoner, on the 23d of June when he committed the act, was insane, because at intervals he was subject to epilepsy ; that during these attacks, and from their effect for a day or two afterwards, he was mentally irresponsible. And it was sought to prove by the witness, who had not seen him thus afflicted for seven months and had not seen him at all for four months, that when he stabbed Sister Hildaberta he was insane ; such an inference would have been wholly unwarranted by the facts testified to by him, and the objection was properly sustained.

The 7th and 8th specifications may be considered together; they charge that the court improperly permitted the commonwealth to adduce evidence of prisoner's drinking habits and drunkenness. As an independent fact, of course this would have been error, but in answer to the defence set up it was clearly admissible. The prisoner had offered evidence that he was subject to epileptic fits from which at times he fell to the floor or ground, and lay in a stupor ; that on recovery his mind was disordered and his memory gone ; that these attacks were so frequent it was fairly inferable for a great part of the time he was insane. In answer, the commonwealth called witnesses who lived near and saw him often, to prove that they never saw him have an epileptic attack, but often saw him drunk and in a drunken stupor. It was alleged from this, that the falls and stupor which prisoner attributed to epilepsy were really due to drink.

If such were the fact, it was the duty of the commonwealth to offer evidence tending to prove it, and it was for the jury to determine whether what was an alleged symptom of epileptic insanity was only drunken prostration. That the fact, if proven, tended to degrade the prisoner in the eyes of the jury was the consequence, not of the court's error in admitting evidence of it, but of his, in affording evidence of it.

The 9th specification of error is in permitting Dr. A. B. Dundore to give an opinion, on seeing the prisoner within an hour after he had killed the deceased, as to whether there were any indications then in his appearance of a recent epileptic attack. Dr. Dundore was a reputable physician of twenty-eight years experience; he stated he saw the prisoner about five o'clock in the afternoon at the station house, and his arm was then bleeding; he said it was injured by a burn, and answered intelligently the questions put to him. The doctor noted his pulse and made such observation of his appearance as an intelligent physician would make of a patient, when called to alleviate suffering from an injured arm. With his long experience, and from this examination, he said there were no indications of a recent epileptic convulsion, and if there had been such an attack within two or three hours he did not think it possible that he then would not have seen some evidence of it. The examination of the prisoner was not a very rigid one, and was not made for the purpose of ascertaining whether there had been a recent epileptic convulsion; but the character of the examination detracted only from the value of the opinion, as expert testimony; it was admissible, and there was no error in placing it before the jury for their consideration.

Concerning the 10th assignment of error, in permitting Dr. Martin Luther to give an opinion as to the prisoner's power of memory from the nature and accuracy of his narrative on the witness stand, that could not possibly have prejudiced the prisoner before the jury. But, taking the whole of Dr. Luther's testimony, we think his opinion as to the strength of memory, in the connection in which it was given, was not objectionable. He was called as an expert to give his opinion, not as to the power of prisoner's memory, but as to the effect of epilepsy on this faculty of the mind, and that there had not been such impairment of it, as indicated epileptic insanity. As an illustra-

tion of a sound memory, he pointed to the prisoner's as shown by his testimony on the stand; "he answered the questions so quickly and understood them so thoroughly that I think his mind was not very much impaired in a general way," says the doctor. How could this have prejudiced the prisoner? Instead of the expert examining him privately, out of sight and hearing of the jury, and then testifying to the conclusion, he states the facts upon which the conclusion is based, on what the jury saw and heard as well as he. This afforded ample opportunity for scrutiny on part of jury and counsel. Were the facts assumed by the expert, facts? Did the prisoner understand and answer questions quickly? There is nothing of substance in this specification of error.

The 11th and 12th assignments may be considered together. The one complains that the court refused to grant an adjournment from Saturday evening until Monday morning; the other, that the time allowed counsel for discussion of the evidence was too short, being only two hours. Both matters were so clearly within the discretion of the court below that we doubt if the learned counsel for appellant seriously expected other than the formal overruling of the assignments, which is now ordered.

The 13th assignment alleges that the court in the charge misstated the argument of counsel to the jury, and then peremptorily negatived the conclusion drawn from it. This is that part of the charge complained of under this specification:

"You will remember that the insanity with which the prisoner is claimed to have been afflicted is deduced principally from the enormity of the crime in the absence of any motive, etc. I charge you, gentlemen, that the enormity of the crime itself is no evidence of insanity." Counsel deny that they, at any time, contended that the enormity of the crime was evidence of insanity; this, say they, is what they argued: "That the prisoner should turn on his benefactress and strike down the hand that had blessed him, was contrary to the conduct of men of sound reason." We do not see any distinction in thought or idea between the two forms of expression; that by the court is perhaps more concise, but the one by counsel leaves the same impression on the mind. Says the court, "enormity of crime is in itself no evidence of insanity;" we did not say it was,

reply counsel, but this is what we said, "for one to strike down his benefactress is contrary to the conduct of men of sound reason;" that is, the prisoner, with every motive for gratitude and tenderness seemingly, was ungrateful and cruel; this combination of ingratitude and cruelty is so startling, that it is highly improbable a sane man would be guilty of it. As, otherwise, the prisoner would be guilty of it, the presumption is he was insane. Obviously, the suggestion is, that the enormity of the crime is evidence of insanity, and the learned judge of the oyer and terminer ought not to be convicted of error for not detecting a distinction which none of us see, plainly as it may appear to the learned counsel for the prisoner.

The 14th specification alleges error in the charge in calling attention to the appearance and conduct of the prisoner during the trial.

That this was altogether proper, it is only necessary to quote what was said by the learned judge: "Now, gentlemen, you will consider the evidence and all of it that bears upon the question of sanity, the evidence of the physicians on both sides, the evidence of those who knew him on both sides, the appearance and conduct of the prisoner before you, and the testimony as to his past acts."

When it is kept in mind that the defence was epileptic insanity, a combination of physical and mental infirmities; that the prisoner was on the witness stand testifying to his own insanity; it was right, in referring to the evidence bearing on this question, to direct the attention of the jury, without suggestion or comment, to the appearance and conduct of the prisoner as facts for their consideration along with the other testimony.

The 19th and 20th assignments are to the silence of the court on prisoner's second and third points. The one asks the court to assume that the testimony of the defence showing epilepsy is not contradicted, and then instruct the jury this fact of itself should be sufficient to raise a doubt as to prisoner's criminal responsibility. The other asks the court to assume as a fact that those afflicted with this disease are easily excited to passion and revenge, accompanied with a morbid irritability, which must impair moral responsibility, and this of itself is sufficient to negative deliberation and premeditation.

The fact as stated in both points was contradicted; not, that prisoner some time in his life had had attacks of epilepsy, but from the evidence it was earnestly contended he had not been afflicted with such attacks for months, perhaps years, before the crime ; and that the light character of the disease in his case had but little, if any, effect on his mental condition. The court should have given an unqualified negative to the points ; simply not noticing them, so far as any possible effect on the jury was concerned, was a more favorable treatment to the pris- oner than an abrupt negative, and he has no ground of com- plaint. The action of the court is a substantial denial of the points, and we so regard it.

The 21st assignment is to error of court in not defining manslaughter to the jury. There was not the semblance of evidence of any provocation, to say nothing of sufficient pro- vocation, for the attack on deceased. It would have been just as pertinent to the issue raised for the court to have defined excusable homicide, and explained to the jury that if Sister Hildaberta had made a furious attack on the prisoner, en- dangering his life, the killing was excusable. The prisoner had a right to instructions on the law applicable to the evi- dence ; as there was no evidence which in the remotest degree pointed to the offence as manslaugher, the court committed no error in not noticing the point.

The 22d assignment alleges error in polling the jury. The prisoner has a right to a poll of the jury to ascertain whether each member concurs in the verdict; the exact words used by a juror in answering are not material, if they indicate clearly the assent of the individual mind to the verdict. The court, before the jury left the box, at the instance of the prisoner's counsel, in a formal and legal manner ascertained that every juryman expressly assented to a verdict of murder of the first degree. This is all that the law requires, or the prisoner has a right to demand; therefore the verdict on which the judgment was entered was correctly recorded.

As to the 23d specification of error, alleging that, on motion for a new trial, the court did not by attachment compel the taking of certain testimony, and have it filed of record, so as to make it a subject of review on this appeal, we can only say the taking of the testimony was a matter wholly for the considera-

tion of the court below.   On the affidavits presented, that court did not consider the testimony sought after of any importance; we would not have reviewed evidence taken on a motion for a new trial, if filed.

The 24th assignment alleges that the court erred in refusing to entertain a plea of insanity at bar when prisoner was called for sentence.

The verdict of the jury on the 12th of September, 1892, found that at the time of the commission of the crime, on the 23d of June previous, the prisoner was sane.   When called for sentence on the 12th of December, 1892, he filed a written averment that since the commission of the crime he had become, and was then, insane.   There was not a single corroborative affidavit of friend, counsel, physician, or jail attendant accompanying the plea; nor a single specific fact stated which might move the court to further inquiry.

As is said in Laros v. Commonwealth, 84 Pa. 200, " the plea at this stage is only an appeal to the humanity of the court to postpone punishment until a recovery takes place, or as a merciful dispensation.   If a case of real doubt arise, a just judge will not fail to relieve his own conscience by submitting the fact to a jury."

We assume that in overruling this plea, the just and humane judge of the oyer and terminer found nothing to raise a doubt in his mind as to the sanity of the prisoner when he was called for sentence.   If there was nothing to raise such doubt, it was his imperative duty to disregard a plea which could only serve to delay the judgment which justice and the law demanded should follow the crime with due promptness.   So this assignment of error is not sustained.

The nature of the crime, the gravity of the consequences to the prisoner, his apparent friendlessness, all seemed to us to demand the most careful scrutiny of this record, that we might detect and correct any error that worked to his prejudice, if any had been made.   We find none.   He had a most careful and fair trial; the zealous efforts of able and astute counsel from a month before the trial, at every stage of the proceedings, down to the final hearing in this court.   The learned judge of the oyer and terminer, in a most clear and impartial charge, submitted the

evidence to the jury, and there is nothing to show the verdict is not the truth.   Therefore, the judgment of the court of oyer and terminer is affirmed, and it is ordered that the record be remitted for the purpose of carrying the sentence into execution.