Commonwealth *v.* Yeager, Appellant.

Argued November 23, 1937. Before SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Edward J. Flynn,* for appellant.

*George O. Wagner,* for appellee.

OPINION BY MR. JUSTICE MAXEY, January 31, 1938:

This is an appeal from the sentence of death imposed in accordance with the jury's verdict, upon the defendant, William H. Yeager, after he was convicted of murder in the first degree upon an indictment charging him with the murder of John Fessler, a member of the Pennsylvania State Police.

Early in the evening of April 22, 1937, the defendant engaged in a quarrel with his wife and other members of his family at his and their home in Cooper Township, Montour County. In the course of the argument Yeager struck his wife over the head with a lantern, causing her head to bleed. One of his sons, Charles "Bud" Yeager, then went to the office of the sheriff of Montour County and asked the sheriff to arrest his father. The sheriff instructed him to go to the office of Austin H. Klase, a

Justice of the Peace, to secure a warrant. This "Bud" Yeager did, charging his father with felonious assault and battery committed on the person of his mother, Gertrude Yeager, and himself. "Bud" Yeager then delivered the warrant to the sheriff who in turn gave it to Deputy Sheriff Wray.

The sheriff called the State Police Barracks at Muncy and asked for assistance in making the arrest. In response to his request, Officers John Fessler, the victim, and Thomas Hooper arrived at the Montour County Jail at approximately 10:20 o'clock p. m. Fessler was dressed in State Police uniform and Hooper wore civilian clothes. These two officers, the sheriff and his deputy then left for the Yeager home in an automobile. At approximately 10:55 p. m. they arrived at the Yeager home, which is not located along the public highway; a lane leads from the public highway to the house and beyond the house to the barn. The officers drove down the lane, passed the house, and parked their car. On the side of the house facing the lane there are two kitchen windows and a window in the kitchen door.

The officers got out of the car and walked single file, Fessler leading, toward the house. Hooper noticed a dim light burning in the kitchen and the two sheriffs noticed the light after they entered the house. Fessler and Hooper, the State Policemen, looked through the kitchen windows and through the window in the kitchen door. Fessler, after looking through the windows, stepped up to the kitchen door, looked through the window in it, and then knocked. They saw no one inside. There was no response to Fessler's knock and he then called the defendant's name and cried out: "State Police. Come out. Sheriff wants to talk to you. We have a warrant for you." There was no reply to this and Fessler then tried the door knob and found it locked. A few minutes later he forced the door open with his knee. Fessler had taken about three steps into the kitchen when a loud shot was heard coming from the in-

side of the house to the right of the kitchen door. Fessler exclaimed: "Tommy, I'm shot." Hooper saw in the end of the kitchen what he described as a "darkened doorway." He called: "Come out with your hands up." A voice replied: "Go away or I'll kill you all." Hooper fired a shot and again called: "Come out with your hands up." There was no reply but "just a mumble or a shuffle coming from the same direction." Hooper fired another shot and called again: "Come out with your hands up." There was again no reply. Hooper fired again "in the direction of the darkened doorway" and then a man came out of this doorway into the room. He had nothing in his hands. Hooper "pinned him against the wall." The sheriff and his deputy then came in and the sheriff placed handcuffs on the appellant.

The officers were attending to Fessler, who was lying on his stomach on the kitchen floor and calling for aid, when they noticed that Yeager had grabbed a revolver lying on the kitchen table and had raised it several inches. He was overpowered. The sheriff then left for Geisinger Memorial Hospital at Danville to secure an ambulance. Officer Hooper attended to Fessler and Deputy Sheriff Wray removed Yeager to the hallway and stood guard over him. Fessler was admitted to the hospital at about 12:05 a.m., April 23rd, 1937. He received immediate medical attention, was operated upon and removed to his room, and at 3:50 a.m. the same day, he died as a result of the wounds inflicted. There were two gun shot wounds, one on the right side of the back a short distance above the crest of the ilium, where the bullet entered, and one on the left side of the back, about two inches higher, where the bullet left the body.

Yeager was also taken to the Geisinger Memorial Hospital and was there treated for gun shot wounds and a wound upon his head. He remained at the hospital until April 28, 1937, when he was removed to the county jail.

There were no witnesses who testified that they saw Yeager shoot. However, at about midnight on April 22, 1937, one hour after the shooting occurred and after Fessler and Yeager had been removed to the hospital, Corporal Eshleman and Officer Reigel of the Pennsylvania State Police made an inspection of the Yeager house. Among a number of things found at the house by these two officers was a 30.06 rifle in a bedroom on the second floor covered with blood. There was blood on the stairway and floor leading from the hallway to this gun.

The examiner of small arms and ammunitions, John Funck, testified, over the objection of defendant's counsel, that the empty cartridge case found on the kitchen floor of the house was fired from this rifle, and that this type cartridge when fired from this rifle produced a loud report.

Defendant was tried and found guilty, and a new trial being denied, was duly sentenced to death. This appeal followed, with twenty-one assignments of error.

The first assignment, which is the one chiefly stressed by appellant, is based upon the refusal of the court to submit to the jury the issue of manslaughter. The court stated to the jury that there were four possible verdicts: "First, murder in the first degree, with the death penalty, or second, murder in the first degree, with life imprisonment, or third, murder in the second degree, or fourth, not guilty."

It is well settled that on a trial for murder where there is no evidence which in the remotest degree points to the offense of manslaughter, the court commits no error in instructing the jury that a verdict of guilty of manslaughter would not be warranted. See *Com. v. Carroll*, 326 Pa. 135, 191 A. 610; *Com. v. Crossmire*, 156 Pa. 304, 27 A. 40, and *Com. v. Buccieri*, 153 Pa. 535, 26 A. 228.

The crime of voluntary manslaughter consists of an intentional and unlawful killing of a human being with-

out malice, either express or implied, but committed under the immediate influence of sudden passion. The sudden passion which will reduce an unlawful killing to voluntary manslaughter must be due to a legally adequate provocation. The law views with some tolerance an unlawful act impelled by a *justifiably passionate* heart, but has no toleration whatever for an unlawful act impelled by a *malicious* heart. In the case at bar there was no evidence whatsoever showing that the killing of State Policeman Fessler was induced by any passion such as anger, rage, resentment or terror arising from a legally adequate provocation. The proof was that after an altercation between defendant and his wife and his son, in the course of which defendant struck his wife over the head with a lantern, injuring her, he, the defendant, loaded his shot gun and placed it near the kitchen stove on the east side of the house facing the lane, and then loaded his rifle and placed it in a corner of the hallway on the west side of the kitchen door, thus having a loaded gun on each side of the kitchen door obviously available for immediate use when officers or his sons or others whom the defendant wished to repel, should seek to enter the house; that the officers drove down the lane and past defendant's house and at the time the lights of the car were visible; and that the defendant saw the car pass the house and drive towards the barn. It is a legitimate inference that defendant had reason to believe that these men were officers even before Fessler had called out: "Come out Yeager; State Police; the Sheriff has a warrant for you." All the evidence points conclusively to the fact that the defendant had deliberately prepared to resist arrest even to the extent of committing murder. Even after Fessler was fatally shot, the defendant was still in a murderous mood, for when the other State Policeman then commanded: "Come out with your hands up," defendant replied: "Go away or I will kill you all." Even after defendant was handcuffed, he grabbed Fessler's revolver

lying on the kitchen table and had raised it menacingly several inches. The evidence fully supports the verdict rendered and entirely excludes any hypothesis of voluntary manslaughter. This first assignment is overruled.

The second assignment is based on an allegation that the whole charge was prejudicial to the defendant, that the court did not adequately direct the attention of the jury to the testimony of defendant's witnesses and the weight that should be given to it, and that the court devoted considerable time to reading extracts from Justice AGNEW's charge in *Com. v. Drum,* 58 Pa. 9. We find no error in this assignment and it is overruled.

The third assignment is based on the admission of testimony of Austin H. Klase, Justice of the Peace, showing that information was lodged before the homicide, by Charles Yeager, that defendant committed a felonious assault and battery on his wife, and that the warrant was given and delivered to the Sheriff of Montour County. The legal purpose of this testimony was to show why the police officers went to the home of defendant, that in being there they were not trespassers, and that in their attempt to enter defendant's home to arrest him, they were acting in obedience to a lawful warrant. This testimony was admissible for the purpose stated. See 30 C. J. 215, sec. 444. This assignment is overruled.

The fourth assignment is based upon the admission in evidence of the criminal information made against the defendant by his son on the fatal evening, and the fifth assignment is based upon the admission in evidence of the warrant of arrest. These assignments are overruled for the reasons stated in overruling the third assignment.

The sixth assignment is based on the admission in evidence of the picture of the body of the victim named in the indictment. The admission of this photograph was a matter within the discretion of the trial judge. This question was recently ruled upon by this court in

*Com. v. Ferry*, 326 Pa. 129, 191 A. 130, where we said, inter alia: "Whenever they [photographs of the bodies of victims named in indictments for murder] are received in evidence, the jury should be instructed as to their purpose and cautioned not to permit the photographs to stir up their emotions to a defendant's prejudice." In the instant case the admission of the photograph served no legal purpose and it could well have been excluded. However, its admission does not amount to reversible error. This assignment is overruled.

The seventh assignment is based on the admission of testimony of witness Joseph Wray to the effect that a few minutes after defendant's arrest he stated that if he had known this he would "have gotten all four of them" (meaning the officers). This was offered in evidence "for the purpose of showing intent and also that the defendant was the person that fired the first shot that was heard." It is well settled that declarations such as this are admissible to show ill-will or consciousness of guilt or guilty knowledge of the offense. See *Com. v. DuBoise*, 269 Pa. 169, 173, 112 A. 461, and 30 C. J. 212, sec. 440. This assignment is overruled.

The eighth assignment is based on the refusal of the trial judge to permit defendant's counsel to further cross-examine Corporal Eshleman, a witness for the Commonwealth. It appears that this witness arrived at the Yeager home about one hour after the shooting and made a preliminary investigation and returned early the next morning to continue his investigation. In the cross-examination referred to, defendant's counsel asked the witness: "Did you swear at them?" (meaning the defendant's children). In asking the question defendant's counsel proposed to elicit the fact that the witness had told the children before leaving at night "not to disturb anything in the kitchen" and when the next morning he had found that the floor was swept, be became angry and cursed them. The trial judge properly exercised his discretion when he interdicted

cross-examination on such an immaterial matter. The eighth assignment is overruled.

The ninth assignment is based on the admission of the testimony of John A. Funck, a member of the Pennsylvania State Police force, whose special duties were to examine small arms and ammunition. It is the contention of the Commonwealth that the rifle in Yeager's house was the rifle from which the fatal shot was fired, that the discharged cartridge found on the kitchen floor was fired from this rifle, that the "spent jacket" was fired from the rifle and came from the used cartridge, and that the unused cartridges found on the kitchen table were of the same type and manufacture as the used cartridge found on defendant's premises. All this testimony was relevant to the issue and as Officer Funck was a competent witness the objection to his testimony was without merit. This assignment is overruled.

The tenth assignment is based on the admission in evidence of the statement made by defendant on the night of April 23rd. In this statement Yeager gave his version of the fatal occurrence. He said: "I saw a car come up the road and by that time they busted my door open and ran to jump on me and I asked them what the hell they wanted and then I shot and someone yelled that they got him in the back and someone hollered State Police was shot. Then I went upstairs for more shells and told them that if they would stop shooting I would come down and give myself up and then I set the rifle down and came down and one fellow gave me a terrible trimming." He was asked: "Did you think they were your sons?" He answered: "Yes, I thought they were my sons." There was no evidence that this statement was secured from Yeager by threats or promises. It was clearly admissible. The statement tends to support a plea of self-defense and its admission gives the appellant no cause for complaint. This assignment is overruled.

90

The eleventh assignment is based upon the admitting over defendant's objection the testimony on cross-examination of defendant in reference to his being twice arrested previously. Yeager described the offenses as follows: "One for hit and run in 1934 and one for the illegal possession of liquor in 1936." Before defendant was asked these questions on cross-examination, he had put his reputation in issue by calling witnesses to establish a good reputation for himself. The prohibitions in the Act of March 15, 1911, P. L. 20, section 1, against the asking of a defendant charged with any crime, and called as a witness in his own behalf, if he has been committed, or been charged with, or been convicted of any offense other than the one with which he is then charged, do not apply if "he shall have at such trial, personally or by his advocate, asked questions of the witness for the prosecution with a view to establish his own good reputation or character, or has given evidence tending to prove his own good character or reputation." See *Com. v. Garanchoskie*, 251 Pa. 247, 96 A. 513. This assignment is overruled.

The twelfth and thirteenth assignments are based on the admission respectively of the record of the Court of Quarter Sessions of Montour County showing that defendant had been arrested in 1934 on a charge of failing to stop and disclose his identity at the time and scene of an automobile accident and had entered a plea of guilty thereto, and the record of the same court showing that defendant had been arrested in 1936 on a charge of possessing unsealed liquor. The Act of 1911 does not forbid the discrediting of defendant's testimony by producing the record of a former conviction. See *Com. v. Pezzner*, 78 Pa. Super. Ct. 286, 288. The admission of these records was not error. These assignments are overruled.

The fourteenth assignment is that the court erred in overruling defendant's objection to the official transcript lodged with the Clerk of the Court, and failing

to make the record comport with the occurrences at the trial, the testimony and the objection being as follows: "The Clerk [addressing the juror]: Ethel Beyers [juror]. Prisoner, look upon the juror; juror look upon the prisoner. What is your verdict in this case? Ethel Beyers: First degree murder with the death penalty. Mr. Flynn [defendant's counsel]: 'First degree murder with the death penalty'; is that the way you put it? Ethel Beyers: Yes sir." The objection of defendant appears to be that when Ethel Beyers, the juror, answered in a tone of voice not audible in all parts of the courtroom, defendant's counsel took it upon himself to be certain that she had answered, "First degree murder with the death penalty." The court below correctly stated: "We cannot see that it makes any difference whether the court or defendant's counsel asked the question complained of. If the juror's answer to the clerk was not heard, either had the right to ask the question." This assignment is overruled.

The fifteenth assignment is based upon the court's definition of reasonable doubt. The definition was ample and correct and gave defendant no cause for complaint. This assignment is overruled. The seventeenth assignment is based upon the refusal of the court to define to the jury the crime of manslaughter. For reasons already stated by us in discussing the first assignment, this assignment is overruled.

The sixteenth assignment is based on an excerpt from the charge of the court on the question of self-defense, as follows: "When self-defense is alleged as a justification or excuse for a killing, the defendant must prove to the satisfaction of the jury by a fair preponderance of the evidence, or it must appear to the jury from a fair preponderance of all the evidence in the case, that the killing was done in self-defense. The raising of a reasonable doubt by a defendant as to whether or not he acted in self-defense is not sufficient to justify his acquittal. The law is that if there be a reasonable doubt

that any offense has been committed by the prisoner, it operates to acquit, but if the evidence clearly establishes the killing by the prisoner with a deadly weapon, an illegal homicide of some kind is established, and the burden then falls upon the prisoner to show that it was excusable as an act of self-defense. If his evidence leaves his extenuation in doubt, he cannot be acquitted of all crime, but must be convicted of homicide. But if his extenuation be proved to the satisfaction of the jury by a fair preponderance of the evidence, he should be acquitted." This excerpt is a substantially correct statement of the law. This court in *Com. v. Colandro,* 231 Pa. 343, 349, 80 A. 571, said: "There was no error in saying that the burden of proving self-defense was upon the defendant and that it would have to be shown to the satisfaction of the jury. . . . But the learned trial judge should have added that they would only have to be satisfied by the fair preponderance of the evidence. Where a defendant sets up self-defense and undertakes to establish his excuse, the evidence relied upon, whether it comes from his side, or from the commonwealth's side, or from both, must, when weighed, show by its fair preponderance the extenuation sought to be established, in order to acquit." In *Com. v. Green,* 292 Pa. 579, 589, 141 A. 925, this court laid down the following rule: "We have said many times that if from any or from all the evidence taken together, a reasonable doubt of the defendant's guilt is raised, there should be an acquittal; the doubt may arise from the whole body of the evidence without regard to, or in the absence of, such elements as those mentioned by the trial judge in the present case, and the defendant was entitled as a matter of law to have the jury so informed." In *Tiffany v. Com.,* 121 Pa. 165, 15 A. 462, this court stated with approval the following from 1 Greenleaf on Ev. sec. 81b: " '. . . if from any, or from all the evidence taken together, a reasonable doubt of defendant's guilt is raised, there should be an acquittal.' " In another part of his charge in the

instant case the trial judge said: "The burden is on the Commonwealth to prove the guilt of the accused beyond a reasonable doubt before there can be a conviction, and the burden never shifts." This was a correct statement of the law and amply protected the defendant's rights on the question of burden of proof. This assignment is overruled.

The eighteenth assignment is based on an excerpt from the charge of the court in reference to the weight to be given the evidence of defendant's good reputation. We have examined the charge carefully and we find nothing to support this assignment. It is overruled.

The nineteenth assignment is based on the refusal of the court to direct a verdict of not guilty; the twentieth assignment is based upon the refusal of the court to grant defendant a new trial; and the twenty-first assignment is the sentence. These assignments are overruled.

The record in this case supports the verdict and the sentence. There were no errors in the admission or exclusion of testimony. The charge was ample and accurate.

The judgment is affirmed. The record is remitted to the court below so that sentence may be executed.