Commonwealth *v.* Sallade, Appellant.

Argued May 26, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.
Appeal, No. 213,

*Charles F. G. Smith,* with him *Cummings & French,* for appellant.

*Robert J. Flint,* District Attorney, for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, June 26, 1953:

Alfred L. Sallade, defendant appellant, appeals from the judgment and sentence of the Court of Oyer and Terminer of Potter County denying motions in arrest of judgment and for a new trial after a verdict of guilty of voluntary manslaughter following an indictment for murder.

Defendant shot and killed Charles Van Pelt, a young man nineteen years of age. The killing is admitted. The issue presented to the jury was whether or not the killing was in self-defense, in the protection of defendant's property or was accidental. The jury by its verdict decided that the killing was without justification.

The deceased, with three of his boy friends and also the father of one of the boys, was spending the 1952 Labor Day weekend in the Cherry Springs Park area near Coudersport, Potter County. The boys intended to do some hunting and, therefore, carried rifles. The four young men left the cabin where they were staying in order to spend an evening camping. They met the father in his automobile, left their equipment with him, and went in search of a camp site. During the search they came across an airport on the edge of which was a lunchroom operated by defendant. The boys stopped in the lunchroom for something to eat. It was testified that about a week previously this lunchroom had been burglarized. During the course of remarks between the boys and a Velma Turner, the person in charge of the lunchroom, a statement made by the boys aroused Mrs. Turner's suspicion that these boys may have had something to do with the burglary. After the boys had finished eating, they chose a camp site near the airport and moved their equipment to the new spot; they then started back to the lunchroom to obtain some ginger ale. Meanwhile defendant came into the lunchroom. He was informed of the remarks which had aroused the suspicion of Mrs. Turner and also that she had seen a car driving around the place in a suspicious manner. The defendant sent Mrs. Turner and her daughter down the road in his car to burn some garbage. It was while the mother and daughter were carrying out the defendant's instructions that the boys reached the lunchroom for the second time. They tried

the door but found it locked. There was evidence that the outer screen door had a connecting bell inside the room which rang when the boys tried to enter and that they had "bucked up against the door". These circumstances led the defendant to believe, he testified, that another burglary was about to be attempted.

When the boys found they could not gain entrance, they went to the adjoining airfield and climbed into a parked plane. At this point Mrs. Turner and her daughter returned. One of them, dressed in slacks, tried the same door by which the boys had tried to gain entrance, found it locked, returned to their car, turned off the headlights, drove to the side of the building facing the airfield, and entered the lunchroom by a side door. Although it was light enough for the boys to witness this incident, they could not discern who was in the car. There was evidence that the boys saw a light flash on and off in a nearby plane. Thus the boys also became suspicious that everything was not right in the vicinity of the airport. They returned to their camp, procured their rifles, and again proceeded to the airport. Upon reaching the field, they split up, two of them going on each side of the building. At about 8:30 p.m. Mrs. Turner had seen the four approaching the airfield and had notified the defendant who had procured a shotgun and was waiting inside the darkened building. When he saw two of the boys coming toward the building, one of them carrying a gun, he shot through a window, fatally wounding Charles Van Pelt and injuring Erwin R. Bergdoll.

Defendant assigns as error the failure of the trial judge to grant his motion to quash the indictment on the ground that it did not sufficiently define the alleged crime. The Act of March 31, 1860, P. L. 427, Sec. 20, 19 PS 351 provides, "In any indictment for murder . . it shall be sufficient . . . to charge that

the defendant did feloniously, wilfully, and of his malice aforethought, kill and murder the deceased. . .". The indictment conforms to the exact words of the statute above cited. This Court has ruled that an indictment drawn in conformity with the provisions of this Act is sufficient: *Goersen v. Commonwealth,* 99 Pa. 388; *Commonwealth v. Bruno,* 316 Pa. 394, 175 A. 518.

The remaining assignments of error relate to alleged trial errors. Two main objections are to two sentences in the court's charge to the jury, relating to the plea of self-defense; viz.: ". . . The guilt of the accused must be established in the first instance beyond a reasonable doubt and when it was so established he is not to be acquitted because the jury after hearing him or his witnesses, may be in doubt as to whether he acted in self-defense. In making that defense he admits his intention of the killing of another and the burden is upon him to show it could not have been avoided. . . ."

It is contended that the jury would be led to believe that it must first consider "the guilt of the accused" before considering the plea of self-defense. This standing alone might have been error under the principle laid down in *Commonwealth v. Palome,* 263 Pa. 466, 106 A. 783. But the next sentence of the charge reads: ". . . Where a defendant sets up self-defense, and undertakes to establish his excuse, the evidence both from his side and the Commonwealth must be weighed so as to show by the fair weight and preponderance of the evidence that it was established, in order to acquit. . . ." Any possible error was cured by this explanation. Of course, the burden always remains upon the Commonwealth to prove beyond a reasonable doubt from all the evidence in the case the guilt of defendant.

Likewise, the instruction that the plea of self-defense admitted the intent to kill was further elaborated upon and explained. At the end of the charge the trial

judge inquired of the defense counsel if there were anything further he wished enunciated, and a request was made to develop this point further. The court then further charged: "... I stated that in making that defense the defendant admits his intention of killing another. By that is meant that *he admits that the act of shooting,* as in this case, there is no denial that the man was shot and the defendant admits that he shot, and I further told you that the burden is on him to show that it could not have been avoided. *You are not to interpret from that remark that he intended the wilful, deliberate and premeditated killing of another. . . ."* (Italics supplied)

Immediately thereafter, the judge asked counsel for defense if that met his requirement. He answered, "Yes Your Honor". A charge must be read in its entirety so that each thought may be scrutinized in the context that it was presented to the jury: *Commonwealth v. Prescott,* 284 Pa. 255, 131 A. 184; *Commonwealth v. Gable,* 323 Pa. 449, 187 A. 393. In reading this charge as a whole, it is evident that the jury was presented with a correct statement of the law.

Another error complained of is the failure of defense trial counsel to petition for change of venue. New counsel was obtained by the defendant to prosecute this appeal. The Act of March 18, 1875, P. L. 30, Sec. 2, 19 PS 552 provides that "All applications for changes of venue shall be made to the court . . . before the jury shall be sworn . . .". Here counsel did not apply for a change of venue as provided by the Act. The failure to apply may not be taken advantage of for the first time on appeal.

It is further contended that the jury should have been permitted to view the scene of the killing. This is entirely a matter of discretion of the trial judge whether or not a view will be permitted: *Commonwealth*

*v. Miller,* 139 Pa. 77, 21 A. 138. There is no evidence that this discretion was abused.

The defendant further argues that the trial judge failed to rule on certain other objections, citing four separate instances. We have carefully reviewed the record and find that in each instance the trial judge made a ruling on the objections, none of which merit discussion.

It is claimed that the Commonwealth was permitted to cross-examine its own witness over the objection of the defendant. The doctor who attended the deceased testified in direct examination that the wounds, in the extended arm position, were on the outside portion of the thumb. Defendant's counsel emphasized in his cross-examination that the position of the arm tended to show that the deceased had raised his rifle. On redirect examination the doctor testified that the arm was in a semi-extended position which would tend to refute the inference that the rifle was aimed at defendant. The doctor was not asked in direct examination the position of the arm but the position of the wounds on the hand. It was, therefore, permissible for the Commonwealth to question the doctor on redirect examination. ". . . The examination of witnesses is to be conducted in such a manner as to discover the truth without taking any unfair advantage . . . The mouth of the witness is not to be closed, because the counsel omitted to ask a material question at first. . . .": *Curren v. Connery,* 5 Binn. 488; *Commonwealth v. Kauffman,* 155 Pa. Superior Ct. 347, 38 A. 2d 425.

The judgment and sentence are affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Alfred L. Sallade, married, and father of three children (ages 10, 8 and 7), has been an airplane pilot for

11 years and operates the Cherry Springs Airport in Potter County, where he also conducts a flying school. On the evening of September 1, 1952, at about 6 o'clock he took off for an hour's instruction flight with one of his students, Rev. Norman C. Larson of the Christian Missionary Alliance, and at the termination of the flight taxied and parked the airplane to and at a point off the runway. At about 7:30 he returned to the airport building in which he owned a lunchroom, run by an advanced flying student, Mrs. Velma Turner (already a licensed pilot) who paid for her tuition by waiting on customers. With her was her daughter, Joyce Turner, 14 years of age, who assisted in the work.

Upon entering the airport building, Mr. Sallade was informed by Mrs. Turner that during his absence four young men had visited the lunchroom and conducted themselves in a manner which caused her to believe they had been involved in the two burglaries which had been perpetrated at the airport recently. Mrs. Turner also told him about a strange car which had been slowly cruising past their place of business in a way to arouse suspicion. Night having now fallen, Mrs. Turner closed the lunchroom for the day and, with her daughter, got into her car to take some garbage to the incinerator down the road.

While they were away, and the lights in the building were extinguished, two men crossed the road adjoining the airport and came toward the lunchroom carrying, what seemed to be, guns. They pressed the door bell, "bucked up against the door," and then disappeared. When Mrs. and Miss Turner returned, Sallade told them that "they were back," meaning that his two nocturnal visitors were the ones who had broken into his place a week before and were probably preparing to break in again. He telephoned the State Police for assistance, telling them of the prowling car and of the

two men who were "trying to break in the front door," whereupon Corporal Auten, with whom he was speaking, gave orders to dispatch a car to the airport.

While awaiting the arrival of the State Police, Sallade took up a posture of defense with a shotgun that he had obtained from his car. A few minutes later he saw, in the moonlight, four men advance along the road carrying rifles and approaching the airport. They passed directly before his gaze at the window and he watched them head toward the rear of the building. Trying to follow their movement through the windows, Sallade now moved into the lunchroom with Mrs. Turner and her daughter, when two of the prowlers suddenly turned the corner of the building and started toward that part of the structure in which he and the two women were concealed in the enveloping darkness. The girl Joyce cried out, "Mama, I'm scared." Sallade, standing in front of an enameled refrigerator, quickly realized that with the moonlight streaming through the window he was a perfect target for anyone who might shoot through the glass. One of the advancing figures now lifted his rifle and pointed it at Sallade in a shooting position, and Sallade fired. The two figures fell, one mortally and the other lightly wounded.

Down through the centuries of the common law, niagaras of printer's ink have cascaded over the ledges of history, thunderously proclaiming the eternal right of self-defense; and yet, on the above undisputed facts, Alfred L. Sallade of Potter County, Pennsylvania, was convicted and sentenced to the Eastern Penitentiary for a term of not less than four years nor more than eight years.

There is not one word in the entire record of 394 pages which would establish, or even hint, that Sallade fired for any reason except to defend himself and the two women in his care. Sallade did not know the de-

ceased Charles Van Pelt or any of his companions, nor is there in the record any indication that he had ever seen them before the fatal night of September 1, 1952.

It may be that Sallade's fears were unnecessary; it could be that Charles Van Pelt never intended to shoot the lethal weapon in his hand, but who can assert that hypothesis with factual certainty? It developed subsequent to the shooting that the deceased and his friends were not attempting any burglary, but the adjudication of Sallade's responsibility to the law is to be ascertained through the facts as they appeared before his eyes at the moment of the tragic happening and not as analyzed ex post facto. The man who kills a bandit who places a revolver to his temple cannot be convicted of any crime if it develops later that the weapon used by the robber was unloaded or was only a toy with every semblance of lethal reality.

The jury in this case were, I believe, led astray by the following unfortunate statement in the learned Trial Judge's charge: "If one without malice but as the result of a great and uncontrollable fear or terror, with or without adequate provocation or cause, does an unlawful act intentionally in such a manner as to cause death or serious bodily harm and death results, or under such circumstances intentionally kills another believing that he is in immediate danger of losing his own life or of receiving serious bodily harm but *without reasonable grounds for such belief,* the crime is voluntary manslaughter.*[1]*

How could one actually believe himself in immediate danger of losing his life or of receiving serious bodily harm, and yet be without reasonable grounds for such belief? One either believes himself in danger or he does not. If one says he was in fear under circum-

---

[1] Italics throughout, mine.

stances which no reasonable person could assess as dangerous, then self-defense is not made out. But when one believes he is in peril of his life, and the circumstances are such to warrant the truth of his belief, he is entitled to an acquittal, no matter how many times it is proved *later* that the threatening revolver was made of glass.

That the jury were confused by the Judge's charge in the above mentioned respect is evidenced by the fact that two hours after they began their deliberations they asked for further instructions on self-defense. And the Judge, who had presided over the trial with unusual ability, patience and alertness, repeated his previous error: "Now I will instruct you further, that if the defendant became seized with an uncontrollable fear or terror that takes away his reason and kills believing that he is in immediate danger of losing his life or receiving great bodily harm but *without reasonable grounds* for such belief, the killing is voluntary manslaughter."

While it is true that the jury were also properly instructed that "one has the right to act on a reasonable appearance of things and the jury will consider what a reasonable man would do under the circumstances," this instruction, in my judgment, was not enough to take them off the wrong path of reasoning on which the Judge had already placed them.

A great responsibility devolved upon the trial Judge to make clear, even if necessary with repetition and emphasis, that the fact the four young men did not perhaps intend to commit any crime did not of itself establish that they were incapable of inflicting great harm, and even death. They were armed with deadly weapons. One carried a .32 rifle, another a semi-automatic .22 rifle, the third a .22 calibre bolt action rifle, and the fourth carried what, under the circumstances, was ca-

pable of as much harm as any of the other three weapons,—a bottle of whiskey. At their youthful age the whiskey could not help but contribute much to their capacity for rashness and dubious frivolity. Charles Van Pelt, the deceased, was 19 years of age; Roger Grigson, 19; Philip Steel, 18; and Erwin R. Bergdoll, 17. They had started out on a camping trip and when they visited the airport lunchroom the second time their purpose was to obtain ginger ale to mix with the whiskey. Unable to get the ginger ale they drank straight from the bottle.

As an illustration of their imprudence it is to be noted that when they caught sight of Sallade's training airplane on the field, the whole four of them climbed on to one of the wings, and lowered themselves through a door, which had been closed, into the interior of the cabin where for some 20 minutes they "looked" at the instruments and controls. It was while they were sitting in the plane, in which they had no right to be and where they might have injured some of the delicate mechanism of the frail craft, that they saw an automobile drive up to the airport building and discharge a couple of persons. At the same time a light in another airplane on the field flashed. These two unrelated incidents set them off on further irresponsible exploits. Roger Grigson, 19, testified: "Q. What did you then do? A. We then decided that something was going on mysterious, we couldn't exactly understand and that being in an airplane certainly wasn't helping ourselves, that it would certainly be wise if we went back and got our rifles. Q. For what purpose? A. So we could then proceed back and *investigate* because it *seemed exciting* and we didn't know exactly what was going on. . ."

There could have been only one purpose in obtaining the rifles and that was to use them if they thought

necessary. Grigson further testified: "Q. Then then [what] did you do? A. Erwin Bergdoll and Philip Steel and myself went back to the fireplace while Charles Van Pelt went over to the camp site where the guns were and got the guns. Q. The camp site was where? A. In back of the pistol range. Q. That is on what side of the road? A. It is on the southern side of Route 44. Q. Very well, proceed. A. We then had *a few drinks out of a bottle* which Philip Steel was given by his father and he had brought up there. Q. Drinks of what? A. *Whiskey,* I don't know the exact make."

The fire of the whiskey kindled the tinder of their youthful and excited imagination and they set forth on the thoughtless adventure which was to end in a manner that a more sober brain could well have anticipated. To approach an inhabited building brandishing dangerous firearms is as perilous as walking the edge of a precipice. And what happened was no more to be unexpected than to imagine that teetering drunkenly on the rim of a cliff will not plunge one into the abyss below.

Philip Steel, 18, was questioned about the investigation that he and the others felt they had to make: "Q. And when you got out of the airplane, you went back to your camp site for the express purpose of getting your guns? A. Yes. Q. And you heard Mr. Grigson testify yesterday that you were going to make an investigation? A. That was the idea. Q. What investigation did you feel you were authorized to make? A. Well, the thing looked sort of mysterious, people driving without lights on, and no lights in the building. Did you feel it was your prerogative to make an armed investigation? Mr. Flint: That is objected to. Mr. Berger: Why. BY THE COURT: I think it is a proper question, I will permit him to answer it. He stated that they went to make an investigation. A. Well,

it was *in the spirit of adventure* I guess that we went there. Q. After you got your guns and came back, you passed in front of the front door of the office building, some little distance away from that, is that correct? A. Yes."

For the young men it was adventure, but for the mother and daughter in the building it was terror. And for Mr. Sallade it was the responsibility of protecting his wards and to save his own three children from possible orphanhood.

Joyce Turner, called by the Commonwealth as one of its witnesses, testified to the action of the deceased Charles Van Pelt: "Q. Then what happened? A. When they came around the corner— Q. I didn't get that. A. I said when they come around the corner, we presumed they saw the car and *one of them drew up his gun.* . . . Q. And one raised a gun? A. Yes. BY THE COURT: Q. In what position did he raise it? A. Well it was just like that (witness indicates position about waist high pointing outward.) Q. Is that the way you have described it? A. Yes, when he raised the arm it was up just like that. (Witness indicates arms slightly over waist high.) . . . Q. Was anything said at that time when the gun was raised? A. I stood right in back of my mother and I grabbed her arm and said 'Mama, I'm scared.' . . . Q. Then what happened, Joyce? A. Al shot just as I said that, Al shot."

That Sallade's fear was genuine and that he had called the State Police for protection was corroborated by the testimony of State Police Corporal George Auten: "Q. Will you testify as to the first report received by you? A. At 8:33, this is Eastern Standard Time— BY THE COURT: Q. P.M.? A. P.M., yes, Alfred Sallade of Cherry Springs Airport called to report two men— Q. Don't read from the report, just refresh your recollection and tell it in your own words?

A. Called to report that some men who acted suspicious to him *were trying to break into the building.* He stated that they left in a 1946 or 1947 Plymouth sedan, proceeding north on Route 44. This car had Ohio plates on it. That was the source of the complaint I received from Mr. Sallade."

The defendant's statement that his place had been burglarized twice before, only 8 days prior to September 1st, was corroborated by State Policeman Robert Baughman.

If Sallade's statement that Van Pelt raised his gun to a firing position before he fired, was substantiated and proved by other evidence in the case, Sallade was entitled to an arrest of judgment after the conviction. Only four persons were in a position to testify to this feature of the occurrence: Mr. Sallade, Mrs. Turner, Joyce Turner and Erwin Bergdoll. I have already referred to Sallade's and Joyce Turner's testimony. Mrs. Turner testified: "Q. Could you see what they had in their hands? A. I saw the one with the rifle and I wasn't sure whether the other had a rifle or not but he had a bottle. Q. What did they do? A. Well, after they started forward, they crouched or stooped, whichever you want to call it, and when they did that was *when they drew the gun* I figured on Alfred. BY THE COURT: Not what you figured, what you saw. A. *That's what I saw.*

"Drawing a gun" is an expression ordinarily associated with a pistol or revolver, which is usually concealed or semi-concealed in a pocket or holster. When the expression is employed in connection with a rifle or shotgun by a person unfamiliar with correct terminology, it can only mean the lifting of the weapon into firing position.

Erwin Bergdoll, who was with Charles Van Pelt at the moment of the shooting (the other two had gone

to the rear of the building), testified that as he and Van Pelt approached the building, Van Pelt was "about 4 or 5 feet behind me and a little to my left." He thus was in no position to testify to whether Van Pelt had lifted his rifle or not. In fact, he so testified: "Q. Immediately prior to the shot, did you observe what Charles was doing? A. No, he was behind me but I think he was following me more or less."

Dr. L. D. Moss who performed the autopsy on the deceased Van Pelt testified that all the wounds on the body of the deceased were *above* the waist. He said further that he found pellet wounds on the fingers of the right hand: "One on the right thumb and another on the right middle finger." Since, as indicated, all the wounds were above the waist, the location of the wounds on the right hand could only mean that that hand was lifted above the waist at the time of the shooting, because had it been hanging at his side normally it would have escaped mutilation. And the doctor so testified: "Q. Doctor, the wounds that you described upon the thumb, the middle finger and the lower part of the arm, could those wounds have been received from your examination, had the arm been hanging below the waist? A. I believe that's very unlikely for the following reason—there are no puncture wounds on the lower part of the body and I would therefore assume *the arm was not hanging down.*" Further: "A. . . . . in view of the fact that there were no puncture wounds in the lower part of the body, I would think it unlikely that the arm was entirely extended. *It could have been in a semi-extended position at the time.*"

And if the hand was above the waist at the moment of the firing, the deduction is inescapable that Van Pelt's hand was lifted in a maneuver having to do with the rifle he was carrying. Thus, *all* the evidence in the

case is to the effect that Van Pelt had lifted his weapon into a firing position, and *none* of the evidence contradicts this.

I regret to say that the learned Trial Judge below, committed, in my judgment, further error in his charge to the jury when he said: "In making that defense [self-defense] he admits his *intention of the killing of another* and the burden is upon him to show it could not have been avoided." Firing in self-defense does not at all mean an intention to kill. One can fire to avoid being killed without intending to kill one's assailant. One could fire to stop or merely to disable the aggressor. And there is nothing in the record which shows any intention, to say nothing of motive, on the part of the defendant to kill Charles Van Pelt. In fact, the only testimony on the subject is that Sallade had *no* intention of killing. The State Policeman who questioned the defendant immediately after the shooting said that the defendant told him: "He said he fired *to stop* them. He figured they had come far enough." The defendant himself testified: "Q. Will you tell the Court and jury what prompted you to shoot at the time you did? A. Well I was afraid that he was going to shoot at us and I shot to stop it. I had no intention, *the thought never entered into my head I was going to kill anybody.*"

Another unfortunate error slipped into the Court's charge, as follows: "The guilt of the accused must be established in the first instance beyond a reasonable doubt and when it was so established he is not to be *acquitted* because the jury after hearing him or his witnesses, may be in doubt as to whether he acted in self-defense." To a lawyer it is very clear that the judge here intended to say "convicted", instead of "acquitted," but the jury not being familiar with legal phraseology may well have understood, as the language

categorically states, that the defendant was *not* to be "acquitted because the jury after hearing him or his witnesses, may be in doubt as to whether he acted in self-defense." Of course, the law is that if the jury is *in doubt* whether the defendant acted in self-defense, its plain duty is *to acquit.* It is too bad that this *lapsus linguae* of the judge was not corrected, but the record shows it went to the jury as quoted, and as quoted it could completely misdirect the jury, to the defendant's disaster.

The verdict in this case was probably also due, to a degree, to the fact that the community was considerably agitated over the death of Charles Van Pelt, a young man of some social note and, as is sometimes true in situations of this character, the rising collective indignation of the surrounding population called for a scapegoat. No doubt that such an imputation would be denied by the citizenry of the locale, but often prejudices occur without one consciously calling them forth. Even against intelligence and an innate sense of fairness, there can be anger and a feeling of intense loss which will demand retribution against somebody or something. The feeling of resentment does not need to be one which is openly demonstrated in mass meetings of protest and cries of vengeance. It can smoulder beneath the surface of seeming intellectual restraint and then, like a sleeping volcano, it can erupt, even through the medium of a decorous trial, in an action which satisfies the feeling of the community regardless of the injuries inflicted on the blindfolded figure of justice.

In this state of affairs a change of venue is practically imperative. The present case should have been tried in a county where the prospective jurors had not had their feelings aroused, but who would listen to the testimony detachedly and without any sensation that they were reflecting the will of a hurt people, the sor-

row of a bereaved family and the outraged good order of the vicinage. I say this in no disparagement of the individual jurors and certainly not of the able trial judge who presided with singular ability over the difficult trial. His error, as I view it, was one of razor edge judgment. Despite his very obvious and praiseworthy intention and effort to keep out all extraneous matters, the invisible and intangible spirit of implacable retribution probably took up a place in the courthouse of Coudersport, Pennsylvania.

In an absolutely neutral atmosphere, I am confident that a weight more in keeping with its importance would have been assigned to evidence in behalf of the defendant than was given to it in Coudersport. For instance, the Cherry Springs Airport had been burglarized on the nights of August 24th and August 25th, and valuable articles and records had been stolen or damaged. The depredations came to the attention of the Sheriff of the County and the State Police of the area, and both of these law-enforcing agencies had come to the airport to investigate and embark on a search for the burglars. On the night of August 26th Mr. Sallade expressed his intention to remain on the premises to catch or identify the burglars if they returned. Friends talked him out of this resolve because of the danger attendant upon an overnight solitary stay at the airport located some distance from the nearest town. However, on the following night his friend Robert Parsons volunteered to stay with him and both of them, armed with a shotgun, a 30 calibre Springfield rifle and a 9 mm. Belgian automatic pistol kept the vigil against the nocturnal marauders who, however, did not put in an appearance.

The tension, fears and apprehensions felt by Alfred Sallade over the two burglaries and the third expected assault undoubtedly preyed on his mind the night of

September 1st. And then, when the suspicions and ominous events of the prowling car, the attempted forcing of the door by the two strange figures and the appearance of the four armed men, all climbed to the climax of a person emerging from the darkness with an extended rifle pointed at him, it was not unreasonable that Sallade should fire in the belief that by so doing he was turning back the aggression he had consciously and unconsciously visualized for over a week.

Divorced from any personal feeling in the matter, a jury in another county would have given a fullness of probative value to these events that the Potter County jurors, conscientious as they of course were, possibly could not give. The inconvenience of a change of venue would have been nothing in comparison to the grim possibility that an innocent man is being marched to the penitentiary for at least four long years.

The learned Trial Judge also erred in not allowing the jury to visit the locale of the shooting. Oral testimony, sketches, and especially photographs, do well in narrating any episode but where so much depends on accurate description of topography, angles of view, buildings and layout of rooms, nothing can take the place of a personal view of the situs of the controverted event. Had the jury actually entered into the lunchroom, and examined the counter, refrigerator, windows, door, gasoline pump and the terrain, all of which formed the set on the stage of this most tragic drama, they could more easily have mentally placed themselves in the role of the various actors, and thus more faithfully have reproduced the actions and reactions of the characters in the sad story. There was only one question in the entire case and its solution required a knowledge of what transpired in Sallade's mind at the moment the shot was fired. Stated familiarly, the question was: what would any reasonable person have done in a sim-

ilar situation? And since so much hinged on the most meticulous and scrupulous adherence to precise physical detail, I cannot come to any other conclusion than that by denying the jurors a view of the premises, they were denied the calipers with which they could have irrefutably measured the unimpeachable guilt or innocence of Alfred L. Sallade.

To call the night of September 1, 1952 at the Cherry Springs Airport a tragedy is to utter the commonplace. Charles Van Pelt at 19 years of age, and with a whole life ahead of him yet to be lived, came to a violent end. Whether any culpability attached to his behavior of the evening is unimportant in the light of the fact that he had to surrender his all, certainly too much to pay for any youthful escapade of the evening. The Van Pelt family probably derived some measure of comfort from Sallade's conviction because by that conviction their boy's record was presumably cleansed of all fault and wrongdoing. But the Van Pelts do not need a conviction for that comfort. Charles Van Pelt was a guileless victim of the times with its appalling emphasis on explosives, firearms and other devices for violent destruction. Nor does comfort for the grieving parents require the infliction of pain and dishonor on Alfred Sallade who was also a victim of a series of events over which he had no control and in the full fury of whose unfoldment he was as much the receiving agent as the contributing force.

I would discharge the defendant and thus close the melancholy chapter in the lives of two unoffending families and in the history of the Cherry Springs Airport of West Branch Township in Potter County, Pennsylvania.