Commonwealth *v.* LaRue, Appellant.

Argued November 8, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*G. Wesley Allen,* with him *Fitzhugh L. Styles,* for appellant.

*Victor Wright,* Assistant District Attorney, with him *Michael von Moschzisker* and *Samuel Dash,* First Assistant District Attorneys, and *Richardson Dilworth,* District Attorney, for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, March 14, 1955:

This is an appeal from a conviction of murder in the first degree with the penalty fixed at death.

Alphonso LaRue, the defendant, is accused of the wilful and deliberate murder of Mildred Walker. She was found dead in her bedroom, with numerous fatal stab wounds on her body. It was accurately and succinctly stated by the learned trial Judge in his opinion refusing a new trial that "The evidence of the Commonwealth linking defendant to the crime was circumstantial in character, consisting for the most part of the testimony of the son of the deceased and other witnesses, together with the signed statement of defendant which had been obtained by the police after the arrest of defendant. Defendant denied that he had stabbed Mildred Walker, and the evidence produced by him suggested that deceased had committed suicide; and defendant's counsel argued that the son of the deceased had the opportunity of stabbing his mother."

We have reviewed both the law and evidence in this case to determine whether the ingredients necessary to constitute murder in the first degree were proved to exist: *Commonwealth v. Davis,* 363 Pa. 91, 69 A. 2d 123; *Commonwealth v. Carey,* 368 Pa. 157, 82 A. 2d 240.

The test of the quality of circumstantial evidence necessary to convict one of murder in the first degree was accurately stated by Justice DREW in *Commonwealth v. Bausewine,* 354 Pa. 35, 40, 41, 46 A. 2d 491: ". . . While the mere fact that the evidence adduced is wholly circumstantial is not fatal to the Commonwealth's case (Commonwealth v. DePetro, 350 Pa. 567, 577, 39 A. 2d 838), yet it must be remembered that guilt must be proved and not conjectured. The reasonable inference of guilt must be based on facts and

conditions proved; it cannot rest solely on suspicion or surmise. These do not take the place of testimony. The facts and circumstances proved must, in order to warrant a conviction, be such as to establish the guilt of the defendant, . . . [not] as being absolutely incompatible with his innocence, but at least beyond a reasonable doubt. . . ." See also: *Commonwealth ex rel. Garrison v. Burke,* 378 Pa. 344, 348, 106 A. 2d 587, and *Commonwealth v. Kloiber,* 378 Pa. 412, 427, 106 A. 2d 820, and cases cited therein.

The evidence produced by the Commonwealth was that the deceased died as a result of stab wounds inflicted on July 30, 1952, at her home at 122 South 57th Street in Philadelphia. The Coroner's physician testified, *inter alia,* that there were twelve wounds on the body of the deceased. Two of these wounds were inflicted from behind, one entering the right side of the back penetrating the kidneys and the other entering the left shoulder. The son of the deceased, a boy seventeen years of age, testified that he came home shortly after 10 P.M., July 30, 1952, and heard the appellant talking upstairs. He heard his mother scream and ran upstairs and saw her lying in the second floor front bedroom. He ran out of the house trying to catch the appellant, but was unable to do so. Three photographs of the front bedroom window and street were introduced into evidence, and the deceased's son stated that the photographs represented the conditions as they existed on July 30, 1952. The deceased's son further testified that appellant and deceased had a quarrel sometime in June and his mother said, in the appellant's presence, that the appellant had threatened to kill her. He stated the appellant had a gun in his pocket, that he did not see it, but only saw the print of his pocket. He further stated that the appellant chased the deceased out of

the house. The deceased's son further stated, on direct examination, that he was not present during any other quarrel between his mother and the appellant. The Commonwealth, in a side bar discussion, pleaded surprise and was permitted by the trial Judge, over appellant's objection, to prompt and lead its own witness. The deceased's son also testified that the appellant had threatened to shoot his mother, that he had taken a knife from a can of lye on the floor and made the appellant drop the gun. He further testified that about two weeks thereafter he heard the appellant say "if I can't have you, no one else will have you". Another witness for the Commonwealth testified that she was visiting the deceased on the night of her death, that she had met the appellant about 5 P.M. that afternoon, that he did not have dinner with them, but that he left shortly thereafter and came back about 9:45 P.M. She stated that the deceased was upstairs dressing when the appellant came in and that he went upstairs. She further testified that she heard the deceased scream and that when she went upstairs she saw the appellant jump out of the bedroom window. A neighbor testified for the Commonwealth that he saw the appellant on the roof of 124 South 57th Street, next door to the deceased's house, and that the appellant dropped down by his hands from the roof to the steps below. A detective testified as to a written statement signed by the appellant on the day of his arrest, August 9, 1952. He was permitted to read this statement after preliminary questioning by appellant's counsel. The statement, which was offered and admitted into evidence over appellant's objection, recited that the appellant was twenty-five years of age, that he lived at 122 South 57th Street, that on the evening of July 30, 1952, after he had a discussion with the deceased about her boy friend, he

went into the lavatory, and while there he heard "a more or less a holler", that when he went back into the room he saw a white-handled paring knife in her hand and while trying to wrench it from her the knife pierced her neck. In the statement, the appellant further stated that he threw the knife in the sewer and that he could not explain why he did so. The Commonwealth further produced a prior conviction of the appellant for robbery while being armed with an offensive weapon in 1945. The trial Judge, at the time of the introduction of this evidence, cautioned the jury as to its use.

Several alleged trial errors are assigned by counsel for defendant as reasons for granting a new trial.

It was not error to permit the district attorney to cross-examine a witness for the Commonwealth upon pleading surprise. Deceased's son, Alphonso Walker, was a witness for the Commonwealth. Prior to the trial he gave a written statement to the district attorney. At the trial he testified that there was no quarrel other than that referred to in his testimony. This was contrary to what he had said in his written statement. At side bar the Commonwealth pleaded surprise and was permitted, over objection, to further examine the witness. The testimony developed the fact that the witness had misunderstood the question and proceeded to tell in detail what had happened on the previous occasion. Since the action of the Commonwealth was in its endeavor to discover the truth, and no unfair advantage was taken of defendant, this did not constitute error: *Commonwealth v. Linkowski*, 363 Pa. 420, 424, 70 A. 2d 278; *Commonwealth v. Sallade*, 374 Pa. 429, 435, 97 A. 2d 528.

Appellant was not prejudiced by the improper rebuttal testimony of a witness. Deceased's son was called by the Commonwealth in rebuttal to refute de-

fendant's testimony that he was deceased's "common law" husband. The witness testified that defendant was not his mother's "boy friend", did not sleep in the same bedroom with her, and that his mother had a boy friend by the name of Huey Thompson. All of this is conceded to be proper rebuttal. However, the witness was allowed to testify as to a fight between defendant and Thompson, the boy friend, where knives were used. It was not shown what the fight was about or the language used. Upon motion of defendant's counsel this portion was stricken from the record as improper rebuttal and the jury was instructed to disregard it. The rejected evidence cannot be regarded as inflammatory or prejudicial to defendant. It was stricken before counsel addressed the jury and the court gave clear and forcible instructions to disregard it. This did not constitute reversible error: *Commonwealth v. Petrillo*, 341 Pa. 209, 19 A. 2d 288; *Commonwealth v. Chavis*, 357 Pa. 158, 53 A. 2d 96; *Commonwealth v. Neill*, 362 Pa. 507, 67 A. 2d 276; *Boyd v. Smith*, 372 Pa. 306, 311, 94 A. 2d 44.

Prejudice did not result from a voluntary remark of Commonwealth's witness. Deceased's son, while testifying in chief concerning quarrels between his mother and defendant, identified the time as "The Sunday after he [defendant] had got locked up". No objection was made by defendant's counsel at the trial. The *district attorney* immediately directed that such answers be stricken from the record. Later, in *cross-examination*, the statement was repeated without objection in response to questions *by counsel for defendant*. Such answers, under the circumstances, did not deprive defendant of the fundamentals of a fair trial: *Commonwealth v. Barnak*, 357 Pa. 391, 419, 54 A. 2d 865; *Commonwealth v. Holley*, 358 Pa. 296, 56 A. 2d 546; *Commonwealth v. Linkowski*, 363 Pa. 420, 70 A.

2d 278; *Commonwealth v. Blose,* 160 Pa. Superior Ct. 165, 169, 50 A. 2d 742.

The reference by the district attorney to defendant's prior conviction was not error. The record showing the conviction of defendant of the charge of armed robbery on May 12, 1945, was offered by the Commonwealth and admitted in evidence. The learned trial Judge, in receiving the record in evidence, stated to the jury: "The record is to be considered by you only for the purpose of aiding you to determine the penalty in the event that the defendant is found by you to be guilty of murder in the first degree. You must not allow the record of this prior conviction of the defendant to influence you in any way in determining the guilt or innocence of the defendant of the charge for which he is now standing trial. This record has no place in your deliberations unless and until you determine under the evidence that the defendant is guilty of murder of the first degree. Then and only then will you consider this record of prior conviction of the defendant for that single purpose in aiding you in determining whether the penalty shall be death or life imprisonment if you find that the defendant is guilty of murder of the first degree." This was properly admitted for such purpose: *Commonwealth v. DePofi,* 362 Pa. 229, 66 A. 2d 649; *Commonwealth v. Lowry,* 374 Pa. 594, 603, 98 A. 2d 733. While no objection appears to have been taken to the admission of this record, objection was made to comments made by the district attorney during his argument to the jury. He said *"The defense counsel speaks of the propensities of the son, what about this defendant? What about his propensities? He's an armed robber."* A motion was made for the withdrawal of a juror. In refusing the motion and in his charge the trial Judge reiterated with great emphasis that the matter of the prior conviction was to be considered by

the jury solely in fixing the penalty. Under these circumstances the rights of defendant were not prejudiced.

The trial Judge did not emphasize Commonwealth's case and minimize that of defendant's. Defendant claims, despite his denial of alternate defense, there existed a possibility that deceased's son committed the homicide and that the court gave this scant attention. This contention is so clearly without substance that it does not merit discussion.

There was no error in refusing one of defendant's points for charge. Defendant requested the trial Judge to charge: "While you may presume the specific intent to kill from death resulting from numerous wounds on the body of the deceased, inflicted by a dangerous weapon, such a presumption may be destroyed by evidence of circumstances indicating a frenzied, emotionally disturbed, or upset state of mind." The request was refused. It was, however, stated: "To constitute a premeditated murder, the jury must find from the evidence the fully formed purpose to kill, with so much time for deliberation and premeditation as to convince them that this purpose is not the immediate offspring of rashness, impetuous temper and uncontrolled passion, and that the mind has become fully conscious of its own design." There is no merit to this objection.

Failure of the trial Judge to submit to the jury voluntary manslaughter as a possible verdict was not error. Where there is some evidence which would reduce the crime to voluntary manslaughter, defendant is entitled to have the jury instructed upon the subject: *Commonwealth v. Flax*, 331 Pa. 145, 200 A. 632. But where there is no evidence of manslaughter, it is proper for the court to refuse to submit to the jury the issue of manslaughter. In *Commonwealth v. Yeager*, 329 Pa. 81, 85, 196 A. 827, Justice (later Chief Justice)

Maxey said: "It is well settled that on a trial for murder where there is no evidence which in the remotest degree points to the offense of manslaughter, the court commits no error in instructing the jury that a verdict of guilty of manslaughter would not be warranted. See Com. v. Carroll, 326 Pa. 135, 191 A. 610; Com. v. Crossmire, 156 Pa. 304, 27 A. 40, and Com. v. Buccieri, 153 Pa. 535, 26 A. 228."

In the statement given to the police at the time of the arrest, he said that he found deceased with a knife in her hand and in trying to wrench the knife away deceased was stabbed. At the trial defendant stated that this account was fictional—true in part and false in part. He testified that when he came out of the bathroom he found deceased on the bedroom floor with stab wounds on her body and he concluded she had committed suicide.

As we understand the appellant's argument, it is claimed deceased possibly may have met her death *accidentally* while he was endeavoring to take the knife away from her. This is contrary to appellant's contention of voluntary manslaughter. If, in fact, he did kill her by stab wounds, the jury could infer that he did so in a sudden rage of passion and resentment. But his version on the *witness stand* is that he found deceased on the floor dead from what he regarded as suicide or crime committed by some one other than appellant. There is not the slightest evidence, if believed, which would indicate that if the appellant committed the crime it was the consequence of rashness, impetuous temper and uncontrolled passion which might, in the jury's decision, reduce the crime to one of voluntary manslaughter.

We have studied this record with care. Judge Hagan tried the case with thoughtful and thorough care. He correctly and accurately charged the jury

and gave appellant every consideration to which he was entitled. We discover no error.

. The judgment is affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The infliction of capital punishment is a grave and awesome thing, and, in my opinion, a death sentence should never be affirmed unless the record shows affirmatively that the defendant's rights under the Constitution and the laws of the land have been zealously guarded and meticulously saved. Under our system of jurisprudence, a court decision in one case becomes authority for decision over other cases with similar acts or those in which an identical principle is involved. Thus, this highest tribunal in. the Commonwealth, as I view it, should not hesitate to send a case back for re-trial where an error in law has been committed, no matter how repellent may be the crime and no matter how odious might seem the character of the person convicted of that crime.

It may be that even if the trial in this case had been impeccably conducted the same verdict would have resulted, but it could also be that, with proper instructions from the learned trial court the jury might have appraised the defendant's fate differently. Moreover, the opportunity to legally win a verdict which is something less than the clap of irretrievable doom in the electric chair's grisly embrace is some-thing that every defendant charged with murder is irrevocably entitled to have.

At the termination of the trial and before counsel summed up to the jury, the District Attorney requested the court to order defense counsel "not to refer to voluntary manslaughter, provocation and passion." The court replied: "I so direct you, because I rule now

that there is no evidence in this case of voluntary manslaughter. There is no evidence of sufficient provocation or hot blood or passion, both of which are necessary to supply—to reduce the charge of murder to manslaughter."

I believe that this ruling constituted serious error built on a mistaken conception of the law of murder and manslaughter. The breadth of the court's unspoken definition of "passion" is not evident from his remark, but it is clear that it is too narrow to cover the scope of that word's meaning as expounded in the law books. Mr. Justice MOSCHZISKER (later Chief Justice), speaking for this Court in the case of *Commonwealth v. Colandro,* 231 Pa. 343, said: " 'Passion, as used in a charge defining manslaughter . . . means any of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection:' 6 Words & Phrases, p. 5227. . . 'Passion which will reduce homicide to manslaughter may consist of either anger . . . or terror . . . The terror from the belief on the part of the slayer that his life is in danger is sufficient, though his belief is not reasonable. . .' "

If there was any possibility that the defendant may have been moved or provoked into his homicidal act because of anger, terror, rage or sudden resentment, there was then the possibility that his crime fitted into the frame of voluntary manslaughter and the jury should have been allowed to pass upon that possible verdict.

The Majority says that the defendant's version "on the *witness stand* is that he found deceased on the floor dead from what he regarded as suicide or crime committed by some one other than appellant." * But

---

* Emphasis by the Majority.

the defendant's defense is not limited to what he said on the witness stand. Nor is it limited to what is advanced by his own witnesses. Whatever supports the theory of innocence or reduction in degree of crime is the defendant's to use in his plea for acquittal or mitigation of penalty, even if it should come from the Commonwealth's side of the case.

"In a murder case the jury are not bound to accept the version of the commonwealth or that of the defense; it is their duty to consider *all the testimony* and to make up their minds therefrom as to the facts. It was possible in this case that the jury might have found that there was a certain amount of truth in the evidence produced by the commonwealth and some truth in that produced by the defense, but that neither side was wholly to be believed." * (*Commonwealth v. Colandro,* supra, 350.)

The Majority makes but a passing reference to the statement obtained from the defendant on the day of his arrest, August 9, 1952, but that declaration of facts is an integral part of the stage on which the dismal killing of July 30, 1952, was re-enacted. From an evidentiary point of view the statement is as important as the oral testimony spoken by the defendant from the witness stand. As soon as the defendant came into the custody of the law he narrated events which, if believed by the jury, could supply the "passion" which could justify a reduction of the crime from murder to voluntary manslaughter: "Q. Did you and Mrs. Walker have any kind of an argument before you went to the lavatory? A. Yes, sir, we had a discussion about Mrs. Walker's boy friend due to the that he hadn't brought any money over as he generally does on Wednesday evening or Saturday. Q. Well did that bring up any

---

* Italics mine, except where otherwise indicated.

kind of an argument or quarrel between you and Mrs. Walker?  A. *Well she accused me of being the cause of her boy friend not coming around on Wednesday with the money,* she went in her dresser drawer and got the knife and I can't recall whether she said anything but I laughed at her and then I left the room and went in the lavatory. *You see the argument was getting a little strong then thats what made me to walk out of the room.*  Q. What position was she in at the time you came back from the lavatory and did she have the knife in her hand at that time?  A. She was sitting on her vanity when I got back, she was on the vanity bench with the knife in her hand, I got to her and took a hold of her right wrist and tried to take the knife away from her, then she got up off the bench but before she got up from the bench while I was trying to wrench the knife from her, she got stabbed in the neck. Then I was still holding onto her hand she got up from the bench we were still struggling and then she dropped the knife on the floor. I picked the knife from the floor and went down stairs and told her son to go upstairs to see about his mother."

How "strong" was the argument which caused the defendant to leave the deceased's room? How much was he in fear when he returned to the room and found the deceased with a knife in her hand? The lower court deprived the defendant of a valuable right which was his under Trial by Jury as guaranteed in the Constitution when he forbade defense counsel from arguing properly introduced evidence to the jury. Was the defendant provoked by the deceased's imputation that it was his fault the deceased's boy friend did not deliver the money she expected on Wednesday? Did the woman's accusation and her drawing of a knife arouse such a resentment in the mind of the defendant as to render him incapable of "cool reflection"? These were

questions falling within the circle of the jury's deliberations, and the Judge had no right to contract that circle so as to exclude these questions from the jury's consideration.

In *Commonwealth v. Curcio,* 216 Pa. 380, 383, this Court said: "The power and duty of the jury to ascertain the degree of murder is fixed by law in this state, and a peremptory instruction that takes from it the power to do this is erroneous: Commonwealth v. Sheets, 197 Pa. 69; Commonwealth v. Kovovic, 209 Pa. 465. While it is not the duty of the court to submit the question of manslaughter where there is *nothing* in the testimony to reduce the grade of the crime below murder, instruction on this subject should be refused only in very clear cases: Commonwealth v. Sutton, 205 Pa. 605. . ."

It cannot be said that there was nothing in the testimony in this case to reduce the grade of the crime below murder. As we said in the same *Curcio* case: "If there is *any* evidence that would reduce the crime to manslaughter, the defendant is entitled to have the jury instructed upon the subject."

In attempting to meet his responsibility of rebutting the presumption of the specific intent to kill, the defendant pointed to the scales on which rested the evidence that the deceased had provoked him and frightened him. The lower court was not warranted in dashing that evidence from the scales for whatever probative value it may have possessed.

In the case of *Commonwealth v. Kluska,* 333 Pa. 65, the defendant was convicted of having killed his wife by throwing acid in her face. His defense was that the death was accidental since he had intended to use the acid for his own self-destruction and only by fortuitous circumstance did it strike the deceased. In ordering a new trial for certain errors committed during the trial,

this Court, speaking through M. Justice STERN (now Chief Justice) said: "Unconvincing as defendant's explanation of the occurrence must have appeared to the jury, he was nevertheless entitled to have it presented for their consideration according to applicable principles of law."

I do not believe that certain evidence in this case was presented to the jury in accordance with applicable principles of law and therefore I would grant a new trial.